U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **FURNITURE 4 LESS, INC., a/k/a** | § | **Case No. 03-80924 HDH-7** |
| **FURNITURE 4 LESS** | § | |
| | § | |
| Debtor | § | |

| | | |
|---|---|---|
| **JOHN H. LITZLER** | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | **Adversary No. 04-3180** |
| | § | |
| **D.M. REID ASSOCIATES, LTD./SOUTH,** | § | |
| | § | |
| Defendant | § | |

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

### FINDINGS OF FACT

1.  Plaintiff is John H. Litzler, Chapter 7 Trustee in the above-referenced bankruptcy case of Furniture 4 Less, Inc. ("Debtor") ("Plaintiff").

2.  Defendant D.M. Reid is a Delaware corporation engaged in the business of conducting promotion sales, including going out of business sales, for clients all over the United States. It has been in business in one form or another for more than 30 years. (David Reid Trial Test.).

3.     D.M. Reid and Debtor entered into a Promotion Agreement ("Promotion Agreement"), under which D.M. Reid and the Debtor agreed that D.M. Reid would, from time to time, provide furniture for a going out of business sale scheduled to begin on March 8, 2003, and continue through June 2, 2003 ("Promotion Sale"). (David Reid Trial Test.; Defs.' Ex. A). At the commencement of the Promotion Sale, the Debtor had seven (7) stores. (John Moran Trial Test.; Defs.' Ex. F).

4.     Debtor agreed to establish a special account for the Promotion Sale which required two signatures, the signature of the store manager and the signature of the Debtor. All revenue from the Promotion Sale would be deposited directly into the special account, including all credit card funds. (Defs.' Ex. A, ¶ 3). From this account, the Debtor's approved overhead would be paid by writing a check to the Debtor and the Debtor would deposit the check into its own account and pay the overhead from that account. Then, expenses of the Promotion Agreement would be paid and, from time to time, payments would be made to D.M. Reid. (Trial Test. of Al Asher and John Moran).

5.     Under the Promotion Agreement, the proceeds of the Promotion Sale would be used first to pay the commissions due to D.M. Reid of 8%; second, to pay the sales commissions due to the sales people of 5% and store manager of 2%; third, for the payment of invoices of the furniture manufacturers from whom D.M. Reid obtained furniture for the Promotion Sale in accordance with the terms of the invoices; fourth, the payment of advertising; and fifth, the payment of predetermined operating expenses of the Debtor. The proceeds of the Promotion Sale could not be used to pay bills of the Debtor which existed prior to the Promotion Sale until all of the obligations owed to D. M. Reid were satisfied. (Defs.' Ex. A, ¶¶ 5 and 16; Al Asher Trial Test.).

6.      Al Asher ("Mr. Asher") was retained as the store manager/sales manager by the Debtor pursuant

to the Promotion Agreement and was one of the signors on the special account. (Defs.' Ex. A,

¶ 14). One of the Debtor's principals, John Moran ("Mr. Moran"), was the other signor on the

special account. The special account was initially established at Bank of America. (Trial Test.

of Messrs. Asher and Moran).

7       D.M. Reid and the Debtor also entered into a Consignment and Security Agreement

("Consignment Agreement") which operated as the financing document relative to the furniture

provided through D.M. Reid's credit for the Promotion Sale. (Defs' Ex. B). The Consignment

Agreement provided that D.M. Reid retained title and ownership of the inventory which it

provided for the Promotion Sale until it was sold to customers. (Defs.' Ex. B, ¶ B2). The

Consignment Agreement provided that, in the alternative, to the extent that the Consignment

Agreement did not effectively create a consignment, whether by operation of law or otherwise,

D.M. Reid was granted a purchase money security interest in all of the inventory provided under

D.M. Reid's credit and a security interest in all of the Debtor's other inventory and that the

interests in question covered proceeds. (Defs.' Ex. B, ¶ C1). The Consignment Agreement, as

well as the Promotion Agreement, also provided that if the Debtor was in default of its

obligations, D.M. Reid could repossess the inventory consigned by D.M. Reid. (Defs.' Exs. B,

¶¶ E1 and 3 and A, ¶ 16(f)). D.M. Reid could also recover attorneys' fees and expenses. (Defs.'

Exs. A, ¶ 18 and B, ¶ E3).

8.      At trial, the parties stipulated that D.M. Reid's consignment/security interest was perfected by the

filing of a UCC Financing Statement with the Texas Secretary of State. (Defs.' Ex.C; Stipulation

of the parties read into the record "Stipulated Facts").

9.      The Promotion Sale began on or about March 6, 2003. (Defs.' Ex. F). In accordance with the Promotion Agreement, the Debtor employed personnel in the area of store management, sales, bookkeeping, store operations, shipping and receiving, and engaged Mr. Asher as a sales manager/store manager. In addition, the Debtor hired Mr. Asher's wife, Maddie Asher ("Mrs. Asher"), to assist with clerical and bookkeeping. D.M. Reid exercised great control of the Debtor's operations during the Promotion Sale. Messrs. Moran and Palmer also remained active on a daily basis with the operations of the business and participated until toward the end of the Promotion Sale. Mr. Moran approved and signed every check and wire transfer until toward the end of the sale when he refused to participate. The Debtor retained its own store manager in each of the stores. (Al Asher Trial Test.; Michael Meadows Dep. Test., pp. 170-174).

10.     The inventory furnished by D.M. Reid was clearly marked as D.M. Reid consigned inventory. D.M. Reid did not mark as D.M. Reid consigned inventory any inventory which D.M. Reid did not procure for the Promotion Sale. (Michael Meadows Dep. Test., pp. 180-181).

11.     The Debtor defaulted on its payment obligations to D.M. Reid. The Debtor would be placed on credit hold by D.M. Reid from time to time because of its delinquency in its obligations. From time to time, D.M. Reid would make demand for payment and the Debtor would either make payment or remain in default. This situation continued throughout the course of the Promotion Sale. The Payable Reports showed the status of the Debtor's delinquencies from time to time throughout the course of the Promotion Sale. (Trial Test. of Messrs. Asher and Reid; Defs.' Ex. H). The payments to D.M. Reid were neither ordinary, nor regular.

12.     In May 2003, the Debtor's representative, Mr. Moran, refused to sign any further Weekly Reports and D.M. Reid became reluctant to extend further credit because of the continuing default on

payments of its invoices. (Trial Test. of Messrs. Moran and Asher). At that same time, the Debtor's representative, Mr. Moran, declined to sign any more checks on the dual signature special account. (John Moran Trial Test.).

13.   The difficulties with the Promotion Sale came to a head when the Debtor experienced problems with its credit card merchant account provider, Paymentech Merchant Services ("Paymentech"). Paymentech had a VISA/MasterCard processing relationship with the Debtor which allowed the Debtor to sell furniture to the public and charge it on the customer's individual credit card accounts. (Al Asher Trial Test.; Michael Meadows Dep. Test., pp. 68-69). Paymentech was presented the charge slips for those sales and the Debtor was paid through Paymentech. On or about May 8, 2003, Paymentech notified the Debtor that it was suspending the funding of credit card transactions on behalf of the Debtor. Paymentech demanded from the Debtor certain information concerning its financial condition and the Promotion Sale in order to resume funding. (Trial Test. of Al Asher, John Moran, and David Reid; Defs.' Ex. K). That information was not provided by the Debtor by the deadline set forth by Paymentech in its letter. (Defs.' Ex. L; Trial Testimony of Al Asher, John Moran and David Reid). Accordingly, on May 19, 2003, Paymentech notified the Debtor that it was terminating its VISA/MasterCard processing relationship with the Debtor effective May 31, 2003. (Defs.' Ex. L). In the meantime, Paymentech immediately diverted all funds for credit card transactions for the Debtor in a reserve account which was to be maintained by Paymentech for a minimum period of 180 days or 90 days after the last charge back. (Defs.' Ex. L). Thus, the funds that would otherwise be available to pay D.M. Reid and other expenses of the Promotion Sale were effectively frozen by Paymentech. This amount was approximately $105,000. (Michael Meadows Dep. Test., p. 68).

14.   The action of Paymentech affected the Promotion Sale. Without credit card sales and without the frozen funds being available to pay bills, it was impossible for the Promotion Sale to continue. (Al Asher Trial Test.; Michael Meadows Dep. Test., pp. 183-186).

15    D.M. Reid, the Debtor, and the Debtor's principals jointly negotiated, prepared and executed, without the assistance of counsel, an agreement ("Release") pursuant to which the Debtor returned all of D.M. Reid's consigned inventory from its remaining locations to D.M. Reid,. D.M. Reid agreed that it could, but was not obligated to, assist the Debtor in completing customer orders that were written by the Debtor during the Promotion Sale as long as there would be no loss to D.M. Reid. The parties agreed that the funds which were being held by Paymentech would remain payable to the Debtor but that the other customer payments would be paid over to D.M. Reid. In contemplation of the arrangement, an account was opened at Point Bank in the name of D.M. Reid about a week before the date of the Release and customer payments began to be deposited into the Point Bank account several days before the Release was actually signed. (David Reid Trial Test.; Michael Meadows Dep. Test., pp. 191-192; Defs.' Ex. X). D.M. Reid released the Debtor and its principals, Messrs. Palmer and Moran, and the Debtor released D.M. Reid from any and all claims. (Defs.' Ex. M). This Court has held the release enforceable. However, the release could not, and does not, release the Debtor from the avoidance actions, which remain in this adversary proceeding.

16.   After the Release was signed, D.M. Reid consolidated the D.M. Reid consigned inventory that remained, valued at $204,041.00 at cost, and began to attempt to complete customer orders from the Debtor's warehouse in Lewisville, Texas. D.M. Reid ultimately received $110,000.00 in

payment of its invoices from the Point Bank account from the post-Release activities. (David Reid Trial Test.; Michael Meadows Dep. Testimony, pp. 188-190)

17.    During the actual Promotion Sale, D.M. Reid furnished inventory to the Debtor at a cost of $1,371,209.11 and also advanced $3,307.10 for supplies. It received a total of $1,050,000.00 in payments on inventory from the Bank of America and Washington Mutual special accounts opened in the Debtor's name (Defs.' Exs. I and U). At the conclusion of the Promotion Sale, D.M. Reid was owed unpaid commissions of $15,853.81. Therefore, when the Release was signed, D.M. Reid was owed a total of $340,370.02. After payment of expenses, D.M. Reid was able to apply an additional $110,000.00 from the Point Bank account to its invoices.

18.    The Trustee asserted a preference claim predicated, in part, upon the theory that D.M. Reid received more than it would have upon a liquidation of the Debtor and a fraudulent transfer claim predicated upon the theory that the Debtor received less than reasonably equivalent value from the Release entered into between D.M. Reid and the Debtor.

19.    By stipulation of the parties, D.M. Reid held a valid consignment/purchase money security interest on all of the inventory that D.M. Reid furnished to the Debtor during the Promotion Sale. By stipulation of the parties, the consignment/purchase money security interest was duly perfected. (Stipulated Facts; Defs.' Exs. B and C). By stipulation of the parties, all of the liens covered the proceeds of all of the inventory as well. (Stipulated Facts; Defs.' Exs. B and C).

20.    The Trustee proved, by a preponderance of the evidence, that D.M. Reid was an insider within the meaning of 11 U.S.C. § 101(31). Specifically, the Trustee proved, by a preponderance of the evidence, that D.M. Reid, through its agents, was a person in control of the Debtor. While Debtor's principals, Messrs. Moran and Palmer, participated on a daily basis during the

Promotion Sale. D.M. Reid's representatives exercised much authority over the Promotion Sales, the proceeds therefrom, and the Debtor's operations. (Al Asher Trial Test.; Michael Meadows Dep. Test., pp. 170-174). All transfers to D.M. Reid occurred more than ninety days prior to the filing of the Debtor's petition. (Defs.' Exs. I, U, and X). However, such transfers were within a year of the bankruptcy filing, and, if avoidable under § 547, a longer one-year period would apply to D.M. Reid because of its insider status.

21.    It was understood by the Debtor that expenses would need to be incurred in order to attempt to generate revenue in the post-Release sale activity. (John Moran Trial Test.). The expenses that were paid from the Point Bank account were the ordinary and necessary expenses relative to the activity that was undertaken in the roughly one month period following the termination of the Promotion Sale and signing of the Release. (David Reid Trial Test.; Defs.' Ex. X). In addition, $30,000.00 was wire transferred from the Point Bank account to the Washington Mutual account on June 24, 2003 to cover checks being written for Promotion Sale bills from that account. (Defs.' Ex. U and K).

22.    On or about May 29, 2003, a new account was set up at Washington Mutual Bank ("Washington Mutual") for the Promotion Sale. The new account was set up at Washington Mutual because of Paymentech's action earlier in May, 2003, terminating the funding of new purchases and freezing funds for purchases that had already been made. The account was opened in the name of the Debtor but bore only the signature of Mr. Asher.

23.    The amount of customer payments that were deposited into the Washington Mutual account on or after May 29, 2003, until the account was no longer used, totaled $335,222.00. From that amount was paid the ordinary and necessary expenses related to the Promotion Sale through the

date that the Release was signed, and other ordinary and necessary expenses related to the Promotion Sale after the Release was signed. (Trial test. Al Asher and David Reid). Of the $335,222.00 deposited into the Washington Mutual account, D.M. Reid received $170,000.00 towards payment of its invoices. (Trial test. Al Asher and David Reid; Defs.' Ex. U).

24.  At trial, the Trustee did not give credit on the consideration side of the ledger to D.M. Reid for the $81,746.45 which the Trustee recovered from Paymentech as a settlement on the reserve account claim, on which D.M. Reid had a valid and perfected security interest on as proceeds of the sale of the inventory. (Trial Test. of David Reid and John Moran; Order on Motion to Compromise entered by the Court on September 15, 2004, of which the Court takes judicial notice).

25.  The evidence establishes that the value transferred to D.M. Reid and the consideration to the Debtor are as follows:

| **Value Transferred to D.M. Reid** | | **Consideration to Debtor** | |
|---|---|---|---|
| Inventory | $ 204,041 | Debt forgiveness | $ 340,370.00 |
| AR - Point Bank | 110,000 | Paymentech settlement | 81,746.45 |
| Total Received | $ 314,041 | Total Received | $ 422,116.45 |
| | | DEFICIT IN VALUE | $ 0.00 |

CONCLUSIONS OF LAW

1.  The payments that were received by D.M. Reid during the course of the Promotion Sale were not made pursuant to the agreements of the parties in the ordinary course of business. The evidence suggests that Debtor fell behind from time to time and D.M. Reid made demands. D.M. Reid actually paid itself – hardly ordinary course. Nevertheless, D.M. Reid had a perfected security interest which continued in the proceeds of the inventory and entitled it to receive all proceeds of the inventory until its obligations were paid in full, which they were not. This lien position ultimately defeats the Trustee's preference claim, but not his fraudulent transfer action.

2.  To the extent that the claim is made that D.M. Reid was paid from sales tax funds collected, those funds would not be property of the Debtor for which the Trustee could make a claim. *Krafsur v. Scurlock Permian Corp. (In re El Paso Refinery, LPI, 171 F.3d 249, 257-58 (5th Cir. 1999); see also, In re Al Copeland Enters., Inc.*, 133 B.R. 837, 839 (Bankr. W.D. Tex. 1991). The Trustee stipulated at the outset of the case that he was not making a claim, or attempting to make a claim, on behalf of the State of Texas. The Trustee would not appear to have standing to make such claims.

3.  The Trustee has not met his burden of proving the avoidability of any transfer under 11 U.S.C. § 547(b). Specifically, due to the filed and perfected security interest of D.M. Reid, the amount of credit it extended and the amount of payments that it obtained, the Trustee failed to meet his burden of proof that D.M. Reid received more than D.M. Reid would have received in a Chapter 7 liquidation. If the case had been a Chapter 7, D.M. Reid would have taken its collateral and proceeds.

4.  The Trustee has not met his burden of proof that the Debtor did not receive reasonably

equivalent value for the Release.  A transfer has been made for reasonably equivalent value so long as the value is within a range of values for which the transferor would have sold the assets in an arms-length transaction.  The determination of what is reasonably equivalent value must be made as of the time of the transfer. *Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119 (5th Cir. 1993).  In the present case, the inventory is valued at cost and the other items are measured in dollars.  The value of the items received by each side is, therefore, not really a matter of dispute.  The Debtor received approximately $108,000.00 more than Reid received for the Release.  This is reasonably equivalent value.

Any conclusion of law more properly deemed to be a finding of fact is hereby incorporated in the Court's Findings of Fact, and vice versa.

Counsel for Defendants shall prepare a judgment consistent with this decision.

SIGNED:  __5/4/05__

_____

**Harlin D. Hale**
**United States Bankruptcy Judge**